So that's Mr. Landau, and Mr. Gratz will be back. And so, Mr. Landau, if you didn't even sit down, you can come right back up. And so on your appeal, you've got 15 minutes in total. And any time you want for rebuttal on Mr. Gratz, you'll have your 15 minutes total, and we'll figure out the rebuttal. Thank you, Your Honor. It may please the Court. As you know, I'm Chris Landau. And this time, I'm here for plaintiff appellant Brandy Melville. I'd like to reserve, again, three minutes for rebuttal if possible. This case involves the same underlying contributory issues. But this case also, our appeal, involves a series of remedial issues. The district court in this case, in fact, made the vindication of trademark rights a losing proposition. Brandy Melville took this case to trial and obtained jury verdicts of willful contributory counterfeiting against Redbubble. But the district court rendered that victory pyrrhic by overturning the jury verdict on the heartmark and denying Brandy Melville attorney's fees, injunctive relief, and prejudgment interest. But that you lose even when you win approach inverts the Lanham Act's remedial scheme, which seeks to encourage and not discourage trademark enforcement. I'd like to focus this morning on the court's nullification of the jury verdict on the heartmark and the denial of attorney's fees and injunctive relief, which are the standard engines to encourage trademark enforcement. Obviously, I'm also open to answering any of your questions on the standard for contributory infringement, as it might apply in this case. Well, I guess on, so if Redbubble could be found to be willfully blind to a general knowledge of infringing activities on its platform, you know, I guess the whole thing, the district court could have possibly made a couple of mistakes here. And if the district court didn't really understand the contributory liability, and then I guess you also have the situation where the district court seems to say, oh, well, it's not the same product, so therefore I don't have to do anything more when I'm comparing them. Like this was on a shirt and the other was on something else, so therefore it couldn't happen. So if those errors occurred, then does it make sense from your standpoint for in the other case, for the court to state what the standard is for contributory liability and willful blindness, and then come back and say, okay, you didn't get it right, so do then we decide just flat out reverse or do we send it back and just say, look at what the right law is and then decide? Well, again, I think. You just want to win, I know that. But I think we believe that the district court here applied the correct standard for contributory liability, which let this case go to a jury, that there's enough room in the joints on what is reason to know what willful blindness means when faced with a lot of this evidence and what reasonable steps are, and that those issues were very vigorously argued to this jury. The district courts here, when it nullified the hard mark, had nothing to do with the standard for contributory liability. Instead, the court said, well, counterfeiting requires me to make sure that the defendant sold a product that was identical to a product sold by the plaintiff. That's a distinct legal error than the whole, than an issue regarding the standard for contributory liability in the first place. If I agree with you on that, which I think that's certainly a colorful argument. If I agreed with you on that, should we just then say, okay, reinstate that part of the verdict, or should we send back and say, no, district judge, you were wrong when you said that. This is what the law is. Look at it again and decide whether you want to. I think you can reinstate the verdict because I think there was, the question is, is there more than enough evidence, is there sufficient evidence to support the verdict? It's just substantial evidence. Right, there's substantial evidence. They made a specific legal argument, and once their legal argument is shown to be incorrect, then you go back to the jury verdict. I mean, that's kind of the default rule is the jury verdict should stand unless there's a reason for it to be stricken. The reason that they gave the judge to strike it, and the reason he accepted, was legally erroneous because counterfeiting does not require the plaintiff to be selling the exact same product as it's meant. You can use a counterfeit mark, just move the mark over six inches. That's not a defense to say, well, that's no longer counterfeit mark. But more in terms of, let's say, one thing's on a T-shirt, and another thing's on a wall hanging, or something like that. Those aren't clearly the same products. But I'm inclined to agree with you that that wouldn't end the analysis. It still could be, there still could be a claim, but it does matter if it's a completely different product. 100%, Your Honor, and let me be very clear, I totally agree with what you said. As this court made clear in the Arcona case, counterfeiting cases still involve the same likelihood of confusion standard as all infringement cases. So if they're vastly different products, yeah, I mean, you could say, well, no reasonable person is gonna think that a Chanel mark on an air conditioning unit is gonna be confused that that might be a Chanel, or at least that's possible. You're right that- I would not be confused. All right, well, you know, right. But I mean, I think the point is, Your Honor, that you are correct, and just to be very clear, our position is not that the product is irrelevant. Our position is that you don't have to have the exact same product to have counterfeiting. And- And so in your view, did the district court just say, since they're not the same product, basically ended the analysis? Exactly, you're right. That's exactly right. That's what- And he needed to go further. What's that? He needed to go further. I mean, it's a relevant inquiry, but it's not dispositive. It is not dispositive. And then he needed to say, okay, is there a likelihood of confusion? Even though it's not the same, you know, and I think here there was ample evidence that this was registered for use on the mark, the Brandy Melville, Brandy Heart Melville, was registered for use on stickers, T-shirts, all the kinds of things that we did sell. I mean, if you go to one of our stores, you see T-shirts and stickers are some of our largest things. When you see a T-shirt that says Brandy Heart Melville, I think it is almost obvious that there could be a likelihood of confusion that that actually came, that the origin of that was Brandy Melville, as opposed to somebody else. Even if you hadn't seen that product before, you would say, well, maybe they came out with a new product that is using that mark. Correct, correct. I mean, if you see a Chanel mark, Chanel may put its trademark here. If they start selling Chanel counterfeits with the mark here, it's no defense to say, oh, no, that's not a counterfeit, even though it's the exact Chanel mark. It's not just a similar thing. It's the exact Chanel mark, but Chanel doesn't sell it with the mark here. That can still be a counterfeit if the mark, again, if you look at the statutory language, it talks about the mark being identical, not the product. And so I think, in normal parlance, we often talk about knockoff products, but the statute is very clear that it's counterfeit marks. And again, what brings the product into the equation is the likelihood of confusion piece of it, going back to your question, Judge Callahan, that that is relevant, and certainly here, but a reasonable jury could certainly find that these kinds of products gave rise to a likelihood of confusion. And not to jump ahead, but you had the same issue here, right, on willful, on the definition of willful blindness and how Omega, whether we adopt that standard, whether the evidence plays into it. If we're gonna try and decide these consistent, there is a theory where we could make this more difficult for you if we adopted the rule that you have to have specific knowledge of specific violations. I'm not, I don't know if that's where we're gonna go, but if we did that, wouldn't that put this whole thing of going back to the trial court, we wouldn't necessarily be, even if we thought there were other errors made, we'd basically just vacate everything and send it back to the district court, wouldn't we? And say- If you change, I mean, if you adopted a, frankly, a novel definition of the standard for contributory liability that was, you know, so high that departed from the other circuits like Omega and 1-800-CONTACTS. I mean, again, our position is that the court- I understand your position. I mean, that's part of what we have to grapple with. And I guess part of this is jumping to the cross appeal because if we agreed with them on the cross appeal here and we agreed with you on the appeal, wouldn't we just basically vacate everything and send it back and say, look at this under the, well, you know, what we may deem as the correct standard, whether it's, I mean, Omega or whatever that standard is. I guess all I'm saying is if we agree with the cross- Ultimately, if we agree with the cross appeal, whether we agree with you on all this stuff doesn't really matter because we couldn't grant you relief. Well, that's right. If you say that the standard for contributory liability is so stringent that no reasonable jury on the facts presented here and in Atari could find it, yeah, then I think that's right. But I mean, we think that this case underscores that that is not possibly the standard. We're not asking, we're not of the theory that we just split the baby, that people, you know, that's not how we decide cases. No, no, I get it. But by the same token, I think what Judge Nelson is saying, it is conceivable, hypothetically, that you could win on part of it and Atari could win on part of it, Redbubble could win on part of it, and then we could just say, do this right. Right, I suppose what concerns me about Judge Nelson's question, honestly, is that his suggestion that, well, I mean, in a sense, the error that the court made on the counterfeiting becomes moot if the contributory liability verdict in that case is if it should never have gone to the jury in the first place. I mean, that is a subject of their cross appeal. I know, and I'm not sure I'm there, but I'm just asking the question because I do think you're right on your appeal, but I'm just trying to figure out how to map that out depending on how we come out of their appeal. I will do my best to convince you that we're right on the standard for contributory liability, because that's, I mean. Let me ask you just briefly on the attorney's fees. Because, I mean, it seems to me your position on the attorney's fees is the common law just, it still pervades this and we can get, or excuse me, I'm talking about prejudgment interest. Common law still pervades this and you can get prejudgment interest even though it's not mentioned in C and it is mentioned in B. That's correct. B came into effect long after A. So let's just take this one step at a time. The general background rule is that when statutes are silent, you assume that Congress does intend an award of prejudgment interest. They say, aha, well, that's not true here because B specifically allows prejudgment interest in trouble damages, counterfeiting cases. So that negates, that creates the presumption that I used it in generous. That means they used it here, they didn't use it there. Our point is that the negative insurance isn't that, doesn't work here when that provision was added 20 years later. There's no reason to think that giving, specifically saying you get prejudgment interest in B, meant to negate the normal availability of prejudgment interest that would have existed under A and C. If these were adopted at the same time, if this was all adopted in the same provision at the same time, presumably Redbubble would have a better argument. That's a much stronger negative inference. But your point is where, just because they wrote it in 20 years later doesn't mean that common law didn't already flow in. I think that makes the negative inference much, much more tenuous. But it does seem odd that you would get prejudgment interest when you have statutory damages generally. Because statutory damages sort of say, Congress has stepped in and said like, I mean, the presumption is they've said these are hard to figure out, so we're just gonna statutorily say what they are. Are there other examples where statutory damages are entitled to prejudgment interest? We cited in our brief, Your Honor, some cases where they granted prejudgment interest on statutory damages, said that that applied. And again, I think it kind of goes to the normal background rule. But I take your point. It is a wrinkle that it is a statutory damages case. And there's not a lot of law on that particular point. I don't want to cut you off, Judge Nelson, but may we let him reserve at this point? Or do you have, did you want to ask another question? No, you're right. Yeah, I mean, yeah. Okay, can I just say very briefly, I mean, the attorney's fees issue is- You can use the whole time. Well, I know, you put me in a quandary, which is, you know, that's what lawyers do. I just want to emphasize, the attorney's fees issue here, if you get to the remedial issues, which we certainly hope you do, is incredibly important. We think the district court made a mistake on basically giving the willfulness no effect, and in- Let me just ask you a quick, if we agree with you on the first point, that the district court erred on granting JML,  have to vacate the attorney's fees? Yes, Your Honor. Because then you're looking at whether there's a high degree of success, and that there was a wrong calculus before. Yes, Your Honor, and that's true also if you agree with us on injunctive relief. That also goes to a lot of degree of success. I just wanted to make sure that I get across how important that point is to us, because in a sense, Congress allowed attorney's fees in these kind of cases, because often they don't involve that much money, and frankly, you might need to encourage litigation- I would also encourage high-priced lawyers to take these cases. Your Honor, you've got to vindicate your trademark rights. Could I reserve the balance of my time? Yes, you may. Thank you. Thank you. All right, Mr. Grasch, you're back. I am back, Your Honor. I would like to begin with what I think is the big issue, which is returning to the contributory standard. There are a couple of items that came up that I want to address quickly, and then move on to the heartmark issue. We heard that the appellants don't think global tech is the standard that applies in a trademark case, and here's why global tech is the standard that applies in a trademark case. First, the Supreme Court said it is the standard for willful blindness, period, and it's been applied in criminal cases, let alone other intellectual property cases. Can I ask, so I'm just thinking back, and a while ago, I was on a panel in the Reddit case, and I'm now realizing there's some similarities here, and I want to go back and look at it, and you may not be familiar with it, but the question there was whether child pornography or child solicitation was being promoted on Reddit, and whether they had knowledge. I think it might have been knowledge was the standard there, and I guess my question is, is willful... Willful blindness? Yeah, willful blindness, it does differ from knowledge. It's lower, right? It is. As global tech explains, it is different from actual knowledge, but it isn't very different from actual knowledge. It is something where, as the Supreme Court said, they can almost be said to have had actual knowledge because they knew enough to avoid learning the specifics. They knew enough to go out of their way to avoid the infringement. For example, even in the Omega case, they went out of their way to avoid opening the door in their building, which is one building. They knew where the infringement was, and they went out of their way to avoid opening the door to see the infringing material in the hidden compartment. Those were the facts under which they said, well, look, in the ordinary course of things, if you hadn't been going out of your way, you would have learned the specifics. You would have been able to take action. And that is what is required under global tech. How do we know global tech applies? This court's Loved Arts case, in the copyright context, applied it directly to the willful blindness question where there was a service provider, and they knew there was general infringement, and the question was, did they have enough knowledge to be liable or have a duty to act? The answer was no. They directly quoted and applied it. How do we know that a standard applied in a copyright case applies in a trademark case? This is directly in Sony. There's actually a footnote in the Supreme Court's Sony opinion footnote 19 where they talk about the relationship between trademark and copyright secondary liability and say, trademark secondary liability is narrow. It's a subset of the situations where you could find copyright secondary liability. So the fact that this court applied global tech in the copyright realm, sort of a fortiori, means that a broader standard couldn't apply in the trademark realm. I wanna return. Yes, the question for me is, as I'm thinking through this more, does willful blindness encompass the theory that the plaintiffs are making here where you are sort of sticking your head in the sand, you're not taking enough. I mean, if it's knowledge, we got a problem. For the plaintiffs, it seems. But willful blindness, does that open up the door to this theory that is just so rampant that you had to know that a high percentage were problematic and that puts an extra duty on you? And I'd be interested in your response to that because your response seems to be, don't worry about it. Willful blindness is so close to knowledge. There really is no gap there. But that's the question is, does that gap allow plaintiff's theories? So on other facts, there is certainly a gap between actual knowledge and willful blindness, even in this circumstance. And here, one example of that is in the Seventh Circuit Amester case. This was a service where infringement was rampant. Infringement is not rampant on Redbubble, but this was a service where infringement was truly, truly rampant. And the service was designed in a way that avoided learning of any specifics so that the service couldn't do anything, even when they got a notice. They designed it in a way so nobody could figure out what notice to send, because everything was encrypted. And the court found that's a service provider being willfully blind. They have gone out of their way to avoid a situation where they might have to take any action. And that is not true when there is general knowledge, particularly not of trademarks in a situation where any knowledge you gained wouldn't, I think, in this situation, as this situation demonstrates, be enough to confidently act, right? We want service providers and anyone who is helping anybody do anything, stop helping in a situation where they know, if I stop helping this thing, this infringement won't happen. That's the standard, and that requires specific knowledge, because you have to know what to stop helping, as opposed to just knowing, well, look, I'm gonna stop helping some stuff, and some of it will be T-shirts that are infringing, and some of it will be original art that everyone would concede isn't infringing, that, for example, like some of the art in the Atari case is just about video games generally and is tagged Atari for that reason. So I wanna return sort of here to the question that the panel asked, which was, what was Redbubble supposed to do? And I will note, you did not get an answer to that question, right? There is not, there wasn't an answer, well, they should have just done this. The closest thing you've heard is they should have turned off searches for Atari, and as the Tiffany court explained, that is not the right answer. The problem for you, it seems, is when you get into the question of what should they have done, now you are entering into the jury question, because that depends on the reasonableness of your actions, and that does seem like a jury question. I think the question we're trying to answer is there's a higher threshold to get to that underlying question, and do the facts here meet it or not? Right, and I think your honor is right, that as counsel said, there are two steps here. One is what was your degree of knowledge or awareness, or what are we going to impute to you by you having deliberately gone out of your way to avoid knowledge or awareness? And then, with that mental state, what did you do, right? Those are, and we are talking here all about the first step, right? What, in what circumstances we can impute what to you? Because if we can't impute to you, you should have taken that thing down. In the second step, there isn't anything to do, right? There isn't, like, that's why the focus in the first question is on, can we impute to you, you should have taken this thing down? And I think the facts here demonstrate this wasn't a situation, and this wasn't a situation, this wasn't close to a situation where Redbubble could confidently take action that would have separated the sheep from the goats and removed infringing material without removing non-infringing material. Let me- Can I ask you about the permanent injunction? Yes. It seems to me, so, part of what the district court relied on was this one-year delay, and so you couldn't have this injured. Seems to me that the delay has a much more impactful, is a more impactful consideration when you're talking about a preliminary injunction. But assuming that Melville was, their trademarks were being infringed here, it seems to me like, why are we talking about the delay in the past? Because then the question is, can you continue with unlawful, when you're talking about a permanent injunction, can you continue with unlawful behavior? So why wouldn't we say, look, I mean, we don't, I guess what I'm wondering is, we don't necessarily need to reverse the district court's finding that delay was a problem, but we could say, for a permanent injunction, it doesn't play as much of a role, and the district court erred in that regard. So to say it doesn't play as much of a role does not lead to a vacatur and remand on the injunction question, because we are not arguing that the district court was compelled to deny a permanent injunction in this circumstance, but that the district court properly took into account, with some weight, that they sat around for a year, notably in this circumstance, with knowledge of the facts, and deciding not to tell us, because they knew the infringement would stop. And that that has enough weight to get rid of the presumption. And that now we are sitting with no presumption, and the plaintiff needs to come forward with sort of evidence of irreparable harm, which they didn't do, right? Well, but isn't it, I mean, it is irreparable. If your trademark's being infringed, why isn't that irreparable harm? Because as it, because in this case, all they do is license it for, so. Because you can come up with a monetary calculation for what that is. Because there is an amount of money that would solve it, and we know there's an amount of money that would solve it because of their behavior, that behavior being sitting, like letting it happen so they get money. Basically is, you know, we, although I don't know if that really answers the question, because it seems to me that there's a lot more that goes into a licensing decision than just the money involved. But it's also the character of the person doing it. I mean, you're like, look, we don't want our mark being used by just all these people on the street. Like, we want reputable, it seems like there's some actual damage, reputational damage that comes from these trademark infringements. Yeah, the Nazi party were using your heart and bolt. You know, that wouldn't be very, I don't think Brandy Melville would be very happy. That's absolutely right. And had Brandy Melville come forward with any evidence of that sort of, that sort of reputational harm to its mark, that couldn't be solved with money. You're saying the declarations and the testimony from their employees didn't amount to that. That's right, or at least that the district court was entitled in this circumstance to find that there wasn't irreparable harm in light of the record being, they said they were experiencing this harm. And comparing what they said to what they did, which is while they were experiencing the harm, sort of letting it go on. So what's the standard of review on that? The standard of review on, the standard review on that is abuse of discretion. And so if I think you're making a reasonable argument, and I also think that Mr. Landau's making a reasonable argument, who wins on standard of review? I do, because the district court declined to grant the injunction. And we agree this is one that could have gone either way. Right, but I'm making a more nuanced point, which is not that we should reverse, I mean, only that we should vacate and remand to say, hey, you've got to consider the difference between the delay in a preliminary injunction versus the delay in a permanent injunction. I don't think the district court did that. So if that is the legal rule that your honors think is the right one, we think you do need to remand. And in that circumstance, there's plenty of other stuff in that analysis that the district court didn't get to. Well, that's my other point, is that there's a whole bunch of, yeah, the other factors that district court didn't even address, because it basically looked at the delay and said, well, you can't have damage, I mean, even you don't believe you can have irreparable damages here, because otherwise you wouldn't have waited. Otherwise he would have done something. That's, I think that's right, your honor. I want, I'm cutting the time, and I want to move on to the heartmark with respect to the JAMAL of no contributory counterfeiting. Because I think this is, so I want to note, if you rule for us and find that the willful blindness standard is a high one, you don't get to this. But I want to address it briefly, because there are two things here, and I think they got a little twisted around each other, both in the district court and maybe a little bit in the briefing. One is, what's the likelihood of confusion analysis? When could somebody be liable for trademark infringement? Ordinary garden variety, likelihood of confusion, trademark infringement. In that circumstance, the similarity of the goods matters, but it's not dispositive. If there is no similarity of the goods in a garden variety non-counterfeiting trademark case, there might still be infringement. The marks don't even have to be identical in a garden variety trademark infringement case. We are talking here, and there was one of those with respect to the heart mark, and I'm not talking about that. I'm talking here about the higher standard for counterfeiting and under the higher standard for counterfeiting, the quantum of proof needed is higher and there is, in the statute, an explicit identity of goods requirement. And that identity of goods requirement does not necessarily- The goods don't necessarily have to be completely indistinguishable, but there has to be a showing, as there was not here, that the plaintiff in fact sells that type of good that they have a registration for that the counterfeit mark appeared on. This is 1116 D1A, and this is an argument they made in the third brief on cross-appeal that we didn't have an opportunity to respond to in the briefs, and so I want to respond to it here. Similarity between the goods isn't just relevant to likelihood of confusion. It's a separate requirement in 1116 D1A for what it means to be a counterfeit mark. That says, and this was, the district court cited this, in order to be a counterfeit mark, something has to be a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, which we think it was. I think we agree. And that is in use. That means they have to be using it on those goods, and there wasn't evidence of that. There is no evidence that the heart mark was on a sticker. There is no evidence that the heart mark was on a hat. There was no evidence that the heart mark was on a T-shirt. And that evidence is necessary to get to a counterfeiting claim exactly for the reason that a Chanel air conditioner can be trademark infringement, but it cannot be counterfeiting because Chanel doesn't make air conditioners. So in order for it to be counterfeiting, it has to be the same type of good as something they put that mark on, and they didn't introduce evidence of stickers or T-shirts or hats with that mark on them. To be clear, they introduced evidence of other stickers and T-shirts or hats that didn't have the mark on them, but not of stickers or T-shirts or hats that had the mark on them. Just another sort of note that we didn't have a chance to get to since we didn't get another brief on this. But your point basically boils down to that counterfeiting is different than trademark infringement, and we seem to be talking more about trademark infringement. We need to look at it more closely as a counterfeiting claim. That's right. That counterfeiting has that higher requirement that this court has said is an explicit identity of goods requirement. In another context, discussing these varying standards in a case called the United States versus Able Time, which is 545 F3rd 824, that divides out the goods need to be the same, a type of good that they are registering it for, and that they are actually selling in the marketplace in order to get the windfall statutory damages, not to get the other remedies. I had intended to reserve a little bit of time, but I have- Well, you're even over, but let me, we took you over. Do you have any other questions? No. All right. I'll give you a minute. I'll read that all. Thank you, Your Honor. Thank you. Thank you, Your Honor. I think everyone here agrees that actual knowledge would be enough for contributory liability. And so the, I think this is turning into kind of a gotcha where they say, well, you can't prove we had actual knowledge but they have conceded that they did have actual knowledge that 24% of the goods on their site were counterfeit. When you combine that with the fact that they're saying, it's not our business to go looking for that. We're just gonna wait till we get a takedown notice. That, it seems to me, alone is enough to say that they were willfully blind to this massive amount of trademark infringement taking use on their site. What is contributory liability all about? It's about saying, okay, we've got the trademark infringers. We also have people who are facilitating that. You are allowing your goods and services to be used in a way that you know is facilitating trademark infringement. That is what this case is about. If this isn't the contributory counterfeiting case, I don't know what is. I mean, these people had a print-on-demand business that they were allowing logos of companies for 24% of the products on their site were not authentic designs. This is in the record. To say that there's not even a jury question presented as to willful blindness under those circumstances is really saying all you have is actual knowledge. And frankly, here, there even is actual knowledge because in both cases, Brandy Melville and Atari, they continued to sell the goods even after we filed the complaint. In this case, how could they have more actual knowledge than a federal court complaint? But between the time of the complaint and the summary judgment, the evidence in both cases showed they continued to have that. So they were on full actual notice in these two cases of actual infringement, and they still didn't take it down. They had a policy, if you read the transcripts here, they basically were kind of ideologically committed to the point that that's not our business. It is absolutely not our business. They can have that few, but that is classic contributory infringement. Okay, so you're going over, so you're asking us to reinstate the verdict. We're asking you to reinstate the Hartmark verdict and to vacate on all the other remedial issues so that we don't wind up losing even when we won in Brandy Melville, and to give us a shot at a jury on contributory liability and a fair trial and direct liability in Atari. Okay. Thank you, Your Honor. Thank you. Thank you. Your Honor, let me just close by saying you don't have to think about most of this if you find that the Supreme Court's global tax standard is the standard. And I think I will leave it at that, unless the panel has questions. Thank you. Thank you both for your arguments in both of these cases. It's always, well, I'm speaking for myself at this point, but I think generally, I think my panel would agree that it's always enjoyable for us to have attorneys that are so well-prepared and are conversant on all of the issues. These are difficult cases, and we appreciate that you both have so aptly represented your clients. Both of these cases will then be submitted as of this date. Thank you.
judges: CALLAHAN, NELSON, THOMAS